1

2

3

4

5

6

7

8        **IN THE UNITED STATES DISTRICT COURT**

9        **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11    REBECCA PAYTON,                              No. CIV S-09-0879-CMK

12              Plaintiff,

13         vs.                                     <u>MEMORANDUM OPINION AND ORDER</u>

14    COMMISSIONER OF SOCIAL
      SECURITY,
15
                Defendant.
16
      _____/
17

18              Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19    review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

20    Pursuant to the written consent of all parties, this case is before the undersigned as the presiding

21    judge for all purposes, including entry of final judgment.  <u>See</u> 28 U.S.C. § 636(c).  Pending

22    before the court are plaintiff's motion for summary judgment (Doc. 17) and defendant's cross-

23    motion for summary judgment (Doc. 22).

24    / / /

25    / / /

26    / / /

                                                   1

# I.  PROCEDURAL HISTORY

Plaintiff applied for social security benefits on February 28, 2005.  In the application, plaintiff claims that disability began on December 27, 1988, at age three.  Plaintiff claims that disability is caused by a combination of Asperger's Syndrome, learning disorder, and morbid obesity.  Plaintiff's claim was initially denied.  Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on January 29, 2008, before Administrative Law Judge ("ALJ") Peter F. Belli.   In an April 25, 2008, decision, the ALJ concluded that plaintiff is not disabled based on the following relevant findings:

1.   The claimant has the following severe impairments: learning disorder and obesity;

2.   The claimant does not have an impairment or combination of impairments that meets or medically equals an impairment listed in the regulations;

3.   The claimant has the residual functional capacity to perform medium work except that she is limited to lifting and carrying 50 pounds occasionally and 25 pounds frequently; she can sit for 8 hours, and stand and walk for 8 hours, in an 8 hour day; the claimant's ability to understand, remember, and carry out short, simple instructions and make judgments on simple work-related decisions is slightly limited; her ability to understand, remember, and carry out detailed instructions, and make judgments on detailed work-related decisions is slightly to moderately limited; she can perform work which requires occasional exposure to the public; her ability to interact appropriately with supervisors and co-workers is slightly limited; the claimant's ability to respond appropriately to work pressures and usual work setting, and to respond appropriately to changes in a routine work setting is slightly to moderately impaired;

4.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

After the Appeals Council declined review on January 30, 2009, this appeal followed.

/ / /

/ / /

/ / /

/ / /

/ / /

## II.  SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains the following evidence, summarized chronologically below:

June 3, 1989 – The record contains a report from Kimberly Weber, M.A., who is a behavioral specialist.  Ms. Weber states:

> Rebecca Payton is a 3 year old girl who has been diagnosed as having aphasia.  While working with Mrs. Payton in her home, since Nov. 1, 1980, concerning the behavioral issues of her son, the Behavioral Specialist was able to observe Rebecca in a variety of situations.
>
> Rebecca emits a high rate of masturbation for a child of her age. During a 2 hour time period while the Behavioral Specialist was in the home Rebecca engaged in masturbation at least 50% of the time.
>
> Rebecca's verbal behavior is also limited.  Rebecca is able to repeat whatever has just been said, using 3 to 4 word phrases or sentences, yet does not initiate conversation.  Rebecca frequently repeats phrases from the television like, Johnson and Johnson or fly American.  Rebecca rarely is able to request exactly what she wants.  Frequently, when Rebecca wants something and is unable to express her needs she will tantrum, cry, or hit others.  If there is a toy or object that Rebecca wants to play with, she will go take the toy from who ever has it.
>
> The Behavioral Specialist believes that these limiting abilities impede her progress a great deal and that a reconsideration of SSI funding should be considered.

October 24, 1989 – The record contains a letter report from Jeffrey Miller, Ph.D. Dr. Miller states:

> In response to your letter dated October 20, 1989, the following is my response to your question posed by me regarding the nature and extent of Rebecca's communication impairment.  As I indicated in my psychological evaluation of her on 7-25-89, she has a significant communication impairment which affects the clarity and content of her speech.  More specifically, she is delayed by about one year in her general language development.  Her language is most likely associated with a neurological disorder.  Furthermore it is likely that she will continue to have significant deficits in her receptive and expressive language skills over the next few years at least.  Additional psychological testing would be necessary in about two years to determine whether or not she has the capacity to overcome these deficits at some point.
>
> As I also indicated in my previous report, research studies on children with similar delays in expressive delays often fall farther behind their age group as they become older if their language skills do not improve significantly by about five years of age.

1          June 11, 2003 – The record contains an Individualized Education Program ("IEP")

2    report.  For strengths, the report indicates that plaintiff is a "good student, works hard."  The

3    report also indicates that plaintiff's communication skills had improved with work in the school

4    attendance office.   The document indicates a severe discrepancy between ability and

5    achievement in math skills only.  No discrepancies were noted in other areas, such as reading and

6    writing.

7          March 29, 2004 – The record contains an IEP report prepared when plaintiff was

8    in 12th grade.  The document indicates that severe discrepancies existed between plaintiff's

9    ability and actual achievement in basic reading and auditory processing.  No discrepancies were

10   noted as to math skills.

11          February 28, 2005 – In her application, plaintiff stated that she became disabled in

12   1988 at age three.  She also stated that she does not need any help in personal care, hygiene, or

13   upkeep of a home.  In an accompanying disability report, plaintiff indicated that she completed

14   12th grade and never took any special education classes.

15          August 8, 2005 – Plaintiff submitted a "Function Report – Adult."  She stated

16   that, on a typical day, she attends school from 7:30 a.m. until 3:15 p.m.  She also stated that she

17   cares for family pets with the assistance of her family.  As to house chores, she stated that she

18   washes the dishes and helps put away groceries.  Plaintiff stated that it takes her 40 minutes to

19   wash the dishes.  She stated that she goes shopping twice a month, does not drive a car, and

20   cannot pay bills.  For social activities, she stated that she goes to school three to five days a week

21   and that this is her primary social outlet.  As to getting along with others, she stated: "My little

22   sister is a pain sometimes."  As to her physical and mental abilities, plaintiff stated that she has

23   difficulty with memory, completing tasks, understanding, and concentration.  She did not report

24   any physical limitations.  She stated she could walk four blocks without rest and could pay

25   attention "awhile, I guess."  She stated that she finishes what she starts and can follow spoken

26   and written instructions "most of the time with help."  She stated that she gets along with

authority figures "o.k."  She also stated that she can handle changes in routine.

August 10, 2005 – Plaintiff's mother – Andrea Payton – submitted a third-party function report.  Ms. Payton confirmed plaintiff's statement that she needs no assistance with personal care.  She stated that plaintiff does not cook and explained that plaintiff "knows she needs to lean how to cook."  She stated that plaintiff washes dishes and her own clothes.  She stated that plaintiff has difficulty with completing tasks, concentration, understanding, and following instructions, but not with memory.  Plaintiff's mother stated that plaintiff could only pay attention for five minutes at a time.  Plaintiff's mother also completed a work history report on behalf of plaintiff. This report indicates that plaintiff has held only one job between June 2003 and June 2004 as a clerk.  In this position, plaintiff worked four hours per day stuffing envelopes with folded newsletters.

August 25, 2005 – Agency examining doctor Sanford Selcon, M.D., submitted a report following a complete medical evaluation.  Dr. Selcon reported the following history:

> The claimant has had a history of learning disability and according to the mother stating aphasic since birth.  The claimant was questioned and the claimant appeared not to be aphasic.  However, the mother insists that this was and remains part of problem.  The claimant, however, has been throughout her grade school and high school career in special education.  She is currently in a special class of teaching of learning at Sacramento City College she is an art major. [sic].  She is able to read and to write and appears to understand quite well and appears not be of aphasic. [sic].

> She had been a slow learner in grade school and high school.  However, she seems to be doing quite well in college.  She has had no medical problems and takes no medication for the condition.

Following an objective examination, the doctor reported the following functional assessment:

> The number of hours that the claimant could sit in an 8-hour work period is without limitations.  The number of hours that the claimant could stand/walk in an 8-hour work period is without limitations.  The amount of weight that the claimant could lift/carry is without limitations.  There are no postural, manipulative, visual, communicative, or workplace environmental limitations.

/ / /

August 30, 2005 – Agency examining psychiatrist Timothy Canty, M.D., reported following a psychiatric evaluation.   Dr. Canty reported the following history:

> She was in special education and describes difficulty in this area. When I asked about her mood she said "It's OK unless somebody says something hurtful to me."  Thankfully, this does not often happen.  She becomes nervous if she has to talk in front of crowds but normally has little anxiety.  She has no mental health treatment, has never been psychiatrically hospitalized, and does not take psychiatric medications.

Following an objective examination, Dr. Canty diagnosed "Probable intellectual difficulties" and assigned a GAF score of "70?"  The doctor offered the following discussion, prognosis, and functional assessment:

> She has no psychiatric disorder.  She has been in special education and probably has some sort of learning disorder.  I would guess that her IQ was in the low normal range.  However, I would recommend obtaining her most recent educational testing from high school.  From a functional standpoint she travels independently to and from college.  She takes both academic and art classes.  Her greatest difficulty appears to be math but she is able to do simple calculations.  She has never applied for a job and apparently is satisfied with being a full-time student.
>
>                    * * *
>
> Her only limitation would be intellectual.  Not having access to testing I cannot specifically comment on her intellectual functioning.  However, she did well on the exam today.  She had no difficulty with attention or concentration.  She was able to do simple math and can clearly handle money on an elemental basis.  Based on her performance today, she could clearly do simple, repetitive, unskilled tasks.  She is friendly and would get along well with others.  She would need a fairly calm, low stress environment.  She has no difficulty with attendance.

September 20, 2005 – An agency consultative doctor submitted a mental residual functional capacity assessment with accompanying psychiatric review technique form.  The doctor concluded that plaintiff was moderately limited in the following areas: (1) ability to understand, remember, and carry out detailed instructions; (2) ability to work in coordination with others without distractions; (3) ability to complete a normal workday without interruptions from psychologically based symptoms; (4) ability to interact appropriately with the general public; (5) ability to accept instructions and respond appropriately to criticism; (6) ability to get

along with co-workers; (7) ability to adapt to changes in the work setting; and (8) ability to travel in unfamiliar places or use public transportation.  In all other categories, plaintiff was not significantly limited.  No marked limitations were noted.  The doctor assessed plaintiff as mildly limited in activities of daily living, and moderately limited in ability to maintain social functioning, concentration, persistence, and pace.  There was insufficient evidence of episodes of decompensation.

December 30, 2005 – Agency consultative doctor George G. Spellman, M.D., submitted a physical residual functional capacity assessment.  The doctor opined that plaintiff could lift/carry 50 pounds occasionally and 25 pounds frequently.  Plaintiff could stand/sit/walk for six hours in an eight-hour day.  Plaintiff's ability to push/pull was unlimited.  No postural, manipulative, visual, communicative, or environmental limitations were noted.

May 28, 2007 – Plaintiff's mother – Andrea Payton – submitted a letter to the ALJ in which she stated:

> My name is Andrea Payton, and I am Rebecca Ann Payton's mother.  I am writing this letter to give you information regarding Rebecca's disability.  Rebecca is one of four children belonging to David Payton and myself, a product of twenty-seven years of marriage.  Rebecca is one of two children that was diagnosed by California Alta Regional Center.  I was told that she had a processing disorder called aphasia, which affects the way she processes information in her brain.
>
> Rebecca's disability affects the way she communicates with us, and others.  At age three she was very quiet, rarely saying anything.  By age four to five her communication skills had improved somewhat giving her the ability to tell us what she wanted to eat, or see.  Communication for Rebecca involved long stories that seemed to involve a great deal of words that at first glance seemed to have nothing to do with what she was trying to relate to the family.  Once we broke the code in the stories she would tell it became a bit easier to meet her daily needs.
>
> Rebecca began attending Special Education classes at age three or four where we worked on clearing up her communication.  She began spending four hours per day in a Special Ed class with other kids with similar disabilities.  Over the years she has progressed to where her needs can be told with shorter stories.  Rebecca still requires verbal prompting to complete her activities of daily living such as prompts for school, appropriate clothing, hair, and items for school.  Family support is required for school assignments that may be beyond Rebecca's scope of understanding.  Rebecca's sisters and myself help her with these tasks as they come up during the school year.  Ordinary examples of problem

solving may require extra time, or repeated instruction for Rebecca to understand how to proceed.  Problems that the average person may get right off the top may cause Rebecca to become overwhelmed resulting in emotional outburst, or Rebecca becoming tearful.  Rebecca's tearful episodes come when she feels she cannot do a task given to her, or when she doesn't comprehend how to carry out the instruction she has been given.  Extended instructions are a part of our daily life when we work with Rebecca.

It is my hope that Rebecca will be reinstated for her benefits.  Rebecca like her brother Andrew are my special needs children.  We have invested countless hours to insure that they are good citizens in the community, and are able to operate safely in the home, and out in the community, although they are not 100% by society standards they have turned out well considering where they started from.  My family is diverse containing an older daughter who is gifted, a son who suffers with autism, Rebecca with aphasia, and the last daughter who is normal.  I count my blessing to have gotten them all through life thus far.  But now they are over eighteen years old and are considered independent, or of legal age.  It is my hope that Rebecca will be allowed to be reinstated as her brother Andrew was back in 2004.  Thank you for your considering this matter.

<u>August 23, 2007</u> – Agency examining doctor John A. Foster, Ph.D., reported on a psychological evaluation.  The doctor reported on the following history and background, as provided by plaintiff and her mother:

The claimant indicated that she graduated high school.  She reported that she was in special education classes and was in a program whereby she worked a part-time job and learned daily living skills.  Ms. Payton stated that she received Bs and Cs in school.  She indicated that she was suspended one time for fighting.  She explained that she did not mean to hurt the other person and had believed they were play fighting.  She is currently enrolled in college at Sacramento City College.

The claimant's mother reported that Ms. Payton has been enrolled in special education courses since she was three years of age.  The mother explained that the claimant was slow to develop language.  According to the mother, the claimants tends to tell long, drawn out stories rather than to answer with a simple response.  She had been given a diagnosis of aphasia.  However, the mother indicated that this diagnosis was given when doctors were unable to figure out what was wrong with Ms. Payton.  The mother further explained that the claimant was tested by her school and given a diagnosis of Asperger's Disorder.  The mother also reported that the claimant had previously been receiving SSI and was followed by Alta California Regional Center until the age of 18.

Ms. Payton is noted to require prompting in order to remember to complete her activities of daily living (ADLs).  She also needs to have directions repeated in order to follow through on tasks.  The claimant is

noted to be able to use the microwave on her own to make simple snacks. However, the mother indicated that the claimant has difficulty cooking items from scratch and tends to put together odd combinations of food when attempting to cook on her own.

Additional information provided by the mother indicated that the claimant did not have any friends in school and preferred to be alone. At home, Ms. Payton is also noted to spend a great deal of time by herself either on the computer or reading comic books. The mother stated that the claimant rarely interacts with her siblings. When she does interact, it is usually only with her younger sister. Ms. Payton reported that she does not socialize a lot. When questioned about her wide knowledge of words, she explained that in high school she did not have a social light, so she would stay home and read the dictionary. She reported that she would often re-copy the definitions out of the dictionary and subsequently acquired the knowledge. She reported that she had forgotten many of the words she learned, although as she reported this, she listed and defined many complex and obscure words.

Following a comprehensive evaluation, Dr. Foster was not able to make any conclusive diagnosis. Instead, he indicated the need to rule out learning disorder, Asperger's Disorder, and/or depressive disorder. The doctor did not indicate any GAF score. Dr. Foster opined as follows with respect to plaintiff's functional abilities:

1. Her ability to relate and interact with supervisors and co-workers is moderately impaired due to her child-like nature, tendency to become easily hurt by others, and her difficulty coping with stressors.

2. Her ability to understand and remember and extensive variety of technical and/or complex instructions is minimally to mildly impaired as evidenced by testing. However, she might have difficulty maintaining this ability in a more stressful environment. Per report, she frequently requires reminders in order to complete her ADLs and household chores.

3. Her ability to understand detailed but uncomplicated job instructions is mildly impaired.

4. Her ability to understand simple one or two-step job instructions is not impaired.

5. Her ability to deal with the public is moderately impaired. Ms. Payton's profile suggests that she lacks self-confidence, is shy, and introverted, and tends to isolate herself from others.

/ / /

6.     Her ability to maintain concentration, persistence, and attention is not impaired as evidenced on testing.  However, in a less structured environment, she might experience mild limitations in concentration.  Per report, she has difficulty focusing and following through on tasks at home.

7.     Her ability to withstand the stress and pressures associated with day-to-day work activity is moderately to significantly impaired.  Personality testing suggests that the claimant has poor tolerance for stress and pressure.  She responds to life in a child-like manner and tends to become overwhelmed with making decisions and carrying out responsibilities.

Dr. Foster concluded that plaintiff is not competent to manage her own funds.

September 12, 2007 – Dr. Foster submitted a medical source statement as to plaintiff's mental abilities.  He assessed mild limitations in plaintiff's ability to understand and remember simple instructions.  Plaintiff was assessed as somewhere between mildly and moderately limited in her ability to understand, remember, and carry out complex instructions. She was assessed as moderately impaired in her ability to make judgment on simple work-related decisions.  She was assessed as somewhere between moderately and markedly impaired in her ability to make judgments on complex work-related decisions.  The doctor notes as follows:

In testing, Ms. Payton demonstrated an ability to comprehend directions. However, she struggled as they became more complex.  In addition, she appears to have difficulty making decisions, particularly major life decisions and is easily overwhelmed by doing so.

Dr. Foster assessed plaintiff as moderately limited in her ability to interact with the public, supervisors, and co-workers.  The doctor noted:

Ms. Payton presents as child-like and socially inadequate.  She tends to avoid social interactions, both in public and in the home.  Per report, she is easily hurt by words and actions of others and tends to have difficulty coping with stress.

/ / /

/ / /

/ / /

1    Undated – Plaintiff grandmother – Sarah Hamilton – submitted a statement

2    regarding plaintiff's functioning.  Ms. Hamilton stated that plaintiff was slow in developing

3    cognitive skills, was quiet, and seldom cried as a baby.  She stated that plaintiff was

4    mainstreamed in elementary and high school and was currently attending college.  Ms. Hamilton

5    stated that plaintiff reads and focuses on words that are not normally used, such as

6    phantasmagoria.  She added that plaintiff requires "prompting for activities of daily living such

7    as grooming and getting ready for school."  Ms. Hamilton stated that plaintiff does not have

8    skills for independent living.  She also stated that plaintiff requires supervision with

9    transportation and money.

10

11                        **III.  STANDARD OF REVIEW**

12                The court reviews the Commissioner's final decision to determine whether it is:

13    (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

14    whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is

15    more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521

16    (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to

17    support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole,

18    including both the evidence that supports and detracts from the Commissioner's conclusion, must

19    be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones

20    v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's

21    decision simply by isolating a specific quantum of supporting evidence.  See Hammock v.

22    Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative

23    findings, or if there is conflicting evidence supporting a particular finding, the finding of the

24    Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

25    Therefore, where the evidence is susceptible to more than one rational interpretation, one of

26    which supports the Commissioner's decision, the decision must be affirmed, see Thomas v.

                                        11

1  Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

2  standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th

3  Cir. 1988).

4

5                                    **IV.  DISCUSSION**

6         In her motion for summary judgment, plaintiff argues: (1) the ALJ erred in

7  determining that plaintiff's statements were not credible; (2) the ALJ failed to properly consider

8  lay witness statements; (3) the ALJ erred in assessing plaintiff's residual functional capacity; and

9  (4) the ALJ erred in failing to inquire of the vocational expert whether there were conflicts

10  between the expert's testimony and the Dictionary of Occupational Titles ("DOT").

11         **A.    Plaintiff's Credibility**

12         The Commissioner determines whether a disability applicant is credible, and the

13  court defers to the Commissioner's discretion if the Commissioner used the proper process and

14  provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).  An explicit

15  credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903

16  F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d

17  821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible

18  and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative

19  evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not

20  credible must be "clear and convincing."  See id.; see also Carmickle v. Commissioner, 533 F.3d

21  1155, 1160 (9th Cir. 2008) (citing Lingenfelter v Astrue, 504 F.3d 1028, 1936 (9th Cir. 2007),

22  and Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

23  / / /

24  / / /

25  / / /

26  / / /

1    If there is objective medical evidence of an underlying impairment, the

2 Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

3 because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d

4 341, 347-48 (9th Cir. 1991) (en banc).  As the Ninth Circuit explained in Smolen v. Chater:

5          The claimant need not produce objective medical evidence of the
           [symptom] itself, or the severity thereof.  Nor must the claimant produce
6          objective medical evidence of the causal relationship between the
           medically determinable impairment and the symptom.  By requiring that
7          the medical impairment "could reasonably be expected to produce" pain or
           another symptom, the Cotton test requires only that the causal relationship
8          be a reasonable inference, not a medically proven phenomenon.

9          80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in
           Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986)).

10

11    The Commissioner may, however, consider the nature of the symptoms alleged,

12 including aggravating factors, medication, treatment, and functional restrictions.  See Bunnell,

13 947 F.2d at 345-47.  In weighing credibility, the Commissioner may also consider: (1) the

14 claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent

15 testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a

16 prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and

17 (5) physician and third-party testimony about the nature, severity, and effect of symptoms.  See

18 Smolen, 80 F.3d at 1284 (citations omitted).  It is also appropriate to consider whether the

19 claimant cooperated during physical examinations or provided conflicting statements concerning

20 drug and/or alcohol use.  See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the

21 claimant testifies as to symptoms greater than would normally be produced by a given

22 impairment, the ALJ may disbelieve that testimony provided specific findings are made.  See

23 Carmickle, 533 F.3d at 1161 (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

24 / / /

25 / / /

26 / / /

As to plaintiff's credibility, the ALJ stated:

At the hearing, the claimant stated that she is attending college and taking courses such as art, ethics, psychology, and writing. She also admitted that she is receiving "Bs" in her classes. She indicated that she does not drive but takes the bus to school. The claimant also stated that she uses the internet 4 or 5 hours a day and researches web sites dedicated to comic books. The claimant's mother stated the claimant needs extra help at school and has problems interacting with others.

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below.

Although the record clearly reflects a history of difficulty socializing and interacting on an appropriate basis, and depicts the claimant as child-like, the record also shows that she has been described as responsible and helpful. She worked in the attendance office while in high school in 2004 and performed well and able to help people (Exhibit B-8E). The claimant attends college and takes public transportation, which requires some ability to appropriately interact with others. She was able to communicate with examiners without any serious difficulty.

Moreover, the record shows that the claimant is a good student and able to achieve good grades in most academic areas. In fact, the claimant admitted that she received "Bs" and Cs" in all of her classes.

The claimant takes public transportation and attends her classes on a regular basis, without any unusual absences. She also is able to maintain concentration for extended periods of time while at school and using the internet for 4 to 5 hours at a time.

Although the claimant certainly experiences some limitations, her daily activities, and demonstrated ability to perform successfully at school, suggests that she is able to function at a higher level than alleged by the claimant and her mother, as well as the opinion of the psychologist who conducted an examination in August 2007 (Exhibit B-15F).

Plaintiff contends that, contrary to the ALJ's characterization of the record, her daily activities support her statements of disabling limitations. According to plaintiff, her daily activities "hardly evidenced an ability to engage in full-time, unaccomodated work on a sustained basis."

/ / /

/ / /

14

The hearing decision reveals that the ALJ relied on plaintiff's daily activities in discounting plaintiff's subjective complaints as not credible.  Specifically, the ALJ noted that plaintiff had a history of working well in the attendance office while in high school, she had been described as responsible, plaintiff attends college on a regular basis, she takes public transportation on a regular basis, plaintiff receives good grades, and plaintiff uses the internet for extended periods of time.  As discussed above, a claimant's daily activities may be considered when assessing credibility.  The ALJ properly did so in this case.

The question is whether there is substantial evidence in the record of the daily activities cited by the ALJ.  The court finds that there is.  A June 2003 IEP report indicates that plaintiff was a good student who worked hard.  Plaintiff's communication skills had improved with work in the attendance office.  No learning discrepancies were noted except in math.  By March 2004 plaintiff's math skills had improved, though discrepancies were noted as to reading and auditory processing.  In her February 2005 application, plaintiff admitted that she does not require help in personal care, hygiene, or upkeep of a home.  An accompanying disability report indicates that plaintiff completed high school and never attended special education classes. In an August 2005 function report, plaintiff stated that, on a typical day, she attends school from 7:30 a.m. until 3:15 p.m.  She stated that she finishes what she starts and can follow instructions "most of the time with help."  In August 2005 Dr. Canty stated that plaintiff did well on examination.  He added:

> . . . She had no difficulty with attention or concentration.  She was able to do simple math and can clearly handle money on an elemental basis. Based on her performance today, she could clearly do simple, repetitive, unskilled tasks.  She is friendly and would get along well with others.  She would need a fairly calm, low stress environment.  She has no difficulty with attendance.

Given this evidence, the court concludes that the ALJ's credibility assessment is supported by the record.

/ / /

1    **B.    Lay Witness Evidence**

2         In determining whether a claimant is disabled, an ALJ generally must consider lay

3    witness testimony concerning a claimant's ability to work.  See Dodrill v. Shalala, 12 F.3d 915,

4    919 (9th Cir. 1993); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e).  Indeed, "lay

5    testimony as to a claimant's symptoms or how an impairment affects ability to work is competent

6    evidence . . . and therefore cannot be disregarded without comment."  See Nguyen v. Chater, 100

7    F.3d 1462, 1467 (9th Cir. 1996).  Consequently, "[i]f the ALJ wishes to discount the testimony

8    of lay witnesses, he must give reasons that are germane to each witness."  Dodrill, 12 F.3d at

9    919.

10        At issue is the ALJ's analysis of third-party statements submitted by plaintiff's

11   mother – Andrea Payton – and plaintiff's grandmother – Sarah Hamilton.  As to Ms. Hamilton's

12   statement, the ALJ stated: "The record also contains a statement from the claimant's

13   grandmother which is generally consistent with the results of the consultative evaluations and the

14   testimony at the hearing, and suggests that the claimant's cognitive skills are intact (Exhibit B-

15   13F)."  The ALJ referenced plaintiff's mother's statements by stating only that the evidence

16   "suggests that [plaintiff] is able to function at a higher level than alleged by the claimant and her

17   mother. . . ."  Plaintiff argues that these references fail to comply with the rule that the ALJ

18   provide reasons germane to each witness for rejecting third-party statements.

19        The court does not agree.  As to plaintiff's mother, the ALJ stated that the record

20   indicates a higher level of functioning than that expressed by the witness.  As discussed above

21   with respect to plaintiff's credibility, this conclusion is supported by substantial evidence in the

22   record.  Inconsistency between the record of plaintiff's daily activities and the statements made

23   by plaintiff's mother's is a specific reason germane to plaintiff's mother for discounting her

24   statements.  The court can find no authority, and plaintiff cites to none, for the apparent position

25   taken by plaintiff here that "germane" somehow means "different."  It is entirely permissible for

26   the ALJ to rely on the same rationale for rejecting the testimony of more than one witness so long

as such rationale is relevant to both witnesses.  Such is the case here where the evidence of

plaintiff's daily activities and level of functioning is inconsistent with the testimony of both

plaintiff and her mother.  The same rationale is germane to both sources.

As to the statement from plaintiff's grandmother Sarah Hamilton, the ALJ found

the statement consistent with the evidence and, for this reason, did not reject it.  Plaintiff argues

that the ALJ's analysis of Ms. Hamilton's statement "was a complete distortion. . . ."

Specifically, plaintiff contends that Ms. Hamilton's statement does not describe a person with

intact cognitive skills.  The court does not agree with plaintiff that there was any distortion.  Ms.

Hamilton reported that plaintiff reads, can comprehend uncommon words such as

phantasmagoria, and attends college.  She also stated that plaintiff was mainstreamed in school.

These statements do not describe a person with a disabling level of impairment to cognitive

functioning.  As defendant notes, even accepting that plaintiff requires "prompting" for activities

of daily living and needs supervision or assistance in certain areas,[1] this does not mean that

plaintiff's cognitive abilities are not intact.

## C.   Residual Functional Capacity Assessment

Residual functional capacity is what a person "can still do despite [the

individual's] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a) (2003); see also Valencia v.

Heckler, 751 F.2d 1082, 1085 (9th Cir. 1985) (residual functional capacity reflects current

"physical and mental capabilities").  Thus, residual functional capacity describes a person's

exertional capabilities in light of his or her limitations.  In determining residual functional

capacity, the ALJ must assess what the plaintiff can still do in light of both physical and mental

limitations.  See 20 C.F.R. §§ 404.1545(a), 416.945(a) (2003); see also Valencia v. Heckler, 751

F.2d 1082, 1085 (9th Cir. 1985) (residual functional capacity reflects current "physical and

mental capabilities").  Where there is a colorable claim of mental impairment, the regulations

---

[1]      Plaintiff herself denied any need for such assistance in her application materials.

17

1  require the ALJ to follow a special procedure.  See 20 C.F.R. §§ 404.1520a(a), 416.920a(a).  The

2  ALJ is required to record pertinent findings and rate the degree of functional loss.  See 20 C.F.R.

3  §§ 404.1520a(b), 416.920a(b).

4          Plaintiff argues that the ALJ's residual functional capacity assessment does not

5  "reflect the extent of the functional limitations credibly described by Rebecca's mother and

6  grandmother" and that the ALJ "also failed to include critical limitations assessed by Dr. Foster

7  who was the only examining physician to provide a mental RFC in the last 10 years."  For the

8  reasons discussed above, the court finds no error in the ALJ's analysis of third-party statements

9  from plaintiff's mother and grandmother.

10          Turning to plaintiff's argument regarding limitations assessed by Dr. Foster,

11  plaintiff essentially challenges the ALJ's assessment of the doctor's opinion.  The weight given

12  to medical opinions depends in part on whether they are proffered by treating, examining, or

13  non-examining professionals.  See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).

14  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater

15  opportunity to know and observe the patient as an individual, than the opinion of a non-treating

16  professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Winans v. Bowen,

17  853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given to the opinion of a non-examining

18  professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4 (9th Cir. 1990).

19          In addition to considering its source, to evaluate whether the Commissioner

20  properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are

21  in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an

22  uncontradicted opinion of a treating or examining medical professional only for "clear and

23  convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831.

24  While a treating professional's opinion generally is accorded superior weight, if it is contradicted

25  by an examining professional's opinion which is supported by different independent clinical

26  findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035,

1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be

rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester,

81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of

the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a

finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and

legitimate reasons, the Commissioner must defer to the opinion of a treating or examining

professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional,

without other evidence, is insufficient to reject the opinion of a treating or examining

professional.  See id. at 831.  In any event, the Commissioner need not give weight to any

conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111,

1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion);

see also Magallanes, 881 F.2d at 751.

As to Dr. Foster, the ALJ stated:

> In August 2007, the claimant underwent consultative psychological
> evaluation.  At this evaluation, her mother stated that the claimant requires
> some help and direction to complete her activities of daily living.  She also
> stated that the claimant does not socialize and spends most of the day at
> home.  The claimant admitted that she attends college classes in the
> morning, and spends that rest of the day on her computer or watching
> televisions.  Upon mental status examination, mood and affect were
> appropriate, however, her presentation was described as childlike.
> Nonetheless, the claimant was articulate and demonstrated a large
> vocabulary.  She was cooperative and understood all direction and requests
> during the interview.  The claimant achieved a verbal IQ of 110, a
> performance IQ of 90, and a full scale IQ of 101 upon intelligence testing.
> Additional academic testing revealed that the claimant was only limited in
> math computation.  The examiner noted that the claimant may have
> difficulty working in a fast paced, high pressure work environment, and
> would have problems interacting with others and making critical work
> place decisions (Exhibit B-15F).

> * * *

> As for the opinion evidence, the Administrative Law Judge notes that the
> psychologist who conducted an examination in August 2007 suggested
> that the claimant experiences additional limitations not delineated in the
> above [residual functional capacity] assessment.  Nonetheless, the
> limitations expressed in this opinion are not supported by the record and

1                     are inconsistent with her proven abilities, which are documented by her
academic achievement and daily activities.  Therefore, the Administrative
2                     Law Judge does not give this opinion significant weight.

3 Plaintiff argues that the ALJ "summarily rejected Dr. Foster's assessed limitations. . .," failing to

4 provide specific and legitimate reasons for doing so.   According to plaintiff: "The ALJ did not

5 point to specific evidence or identify how Dr. Foster's assessed limitations were inconsistent

6 with the record.  He simply concluded that they were."

7              Here, the ALJ rejected Dr. Foster's opinions because they were inconsistent with

8 plaintiff's daily activities and academic achievement and also because they were not supported

9 by other objective evidence of record.  As framed by plaintiff, the question is whether Dr.

10 Foster's opinions are in fact inconsistent with other evidence of record.  The court finds that they

11 are.  For example, Dr. Foster opined that plaintiff was moderately impaired in her ability to

12 interact with the public.  This, however, is contradicted by plaintiff's ability to attend college and

13 relate successfully with classmates and the instructors sufficient to achieve good grades.  It is

14 also inconsistent with Dr. Canty's August 2005 assessment that plaintiff would be able to get

15 along with others.  Moreover, it was appropriate for the ALJ to give Dr. Foster's opinion little to

16 no weight given that the doctor stated that he was unable to make any conclusive diagnosis and

17 did not assign any GAF score.

18        **D.**    **Vocational Expert Testimony**

19              Citing <u>Massachi v. Astrue</u>, 486 F.3d 1149 (9th Cir. 2007), plaintiff argues that

20 "the ALJ cannot rely on the testimony of a vocational expert without first inquiring whether the

21 expert's testimony conflicts with the Dictionary of Occupational Titles" and that the failure to do

22 so requires a remand.  According to plaintiff, the vocational expert testified that plaintiff could

23 perform jobs which require a higher level of math skill under the DOT than allowed by her

24 impairments.  Plaintiff contends:

25                     Because the ALJ failed to question the VE regarding any
conflicts between her testimony and the DOT, this blatant
26                     discrepancy with DOT was not uncovered.  The ALJ relied upon

the VE's testimony and as a result identified jobs that, according to the DOT, were inconsistent with Ms. Payton's abilities.  At a minimum, Ms. Payton's case should be remanded so that reliable VE testimony can be taken.

As defendant notes, if there is no conflict between the DOT's requirements for a specific job and the jobs the vocational expert testified a claimant can perform in light of the claimant's residual functional capacity, there is no reversible error.  The court finds that such is the case here.  Plaintiff's argument flows from the mistaken notion that the record supports the conclusion that plaintiff's math skills are limited to below what would be required for the jobs the vocational expert testified she could perform.  Because the record does not support such a conclusion regarding limited math skills, there was no conflict between the DOT and the vocational expert's testimony.

## V.  CONCLUSION

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY ORDERED that:

      1.    Plaintiff's motion for summary judgment (Doc. 17) is denied;

      2.    Defendant's cross-motion for summary judgment (Doc. 22) is granted; and

      3.    The Clerk of the Court is directed to enter judgment and close this file.

DATED: September 27, 2010

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE